**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MICHAEL R. BOYER,

    Plaintiff,

    v.

CAPTAIN WALTER ISER,
WARDEN FRANK BISHOP,
J. McMAHAN,
CASE MGMT. RICHARD RODERICK,
B. CORNACHIA,
WILLIAM THOMAS,
DEP. DIRECTOR ROBIN WOOLFORD,
RUSSELL NEVERDON,

    Defendants.

Civil Action No.:  PWG-20-1260

**MEMORANDUM OPINION**

Defendants Capt. Walter Iser, Warden Frank Bishop, Jason McMahan, Bethany Cornachia, Lt. William Thomas, and Deputy Director Robin Woolford filed a Motion to Dismiss or for Summary Judgment in response to this civil rights complaint.  ECF No. 19.  Plaintiff Michael Boyer, an inmate confined to the North Branch Correctional Institution ("NBCI") opposes the motion. ECF No. 28.  Defendants filed a Reply.  ECF No. 31.  The matters have been fully briefed and are ripe for dispositive review.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendants' motion, construed as a Motion for Summary Judgment, shall be granted.

## I.   Background

### A.   Complaint Allegations

Plaintiff states in his original complaint[1] that he was placed on administrative segregation on July 7, 2013 by Case Management staff because "reasons exist to believe [he was] a danger to the security of the institution and/or inmates and/or staff." ECF No. 1 at 5. This assignment occurred after Plaintiff had completed thirty months of disciplinary segregation. *Id.* Plaintiff states that he did not incur any infractions for rule violations from July of 2011 through October of 2019. *Id.*

Although inmates who are assigned to administrative segregation are to have their status reviewed by Case Management every thirty days, Plaintiff states that his reviews were held at inconsistent intervals over the years he was so assigned. ECF No. 1 at 6. He claims there were multiple occasions where he did not know if his assignment had been reviewed because he was never called out for the review; rather, he simply received a monthly summary sheet. *Id.* The monthly reviews he received did not state a rationale for his continued assignment but simply relied on the initial reason for placing him in administrative segregation. *Id.*

Plaintiff maintains that he has been "perpetually condemned and confined" for over seven years to administrative segregation, has never been offered any alternatives to "long term ad seg," and no investigation has been conducted to determine if any "perceived threat has been nullified." ECF No. 1 at 7. Plaintiff sought out opportunities to participate in group programs but "he was denied for years." *Id.* at 8.

---

[1] Plaintiff's initial and amended complains (ECF Nos. 1 and 12) purport to be verified per 28 U.S.C. § 1746. However, they fail to state that the facts they contain are based on personal knowledge. Instead, the complaints verify that the facts are true to the best of Plaintiff's "information, belief, and knowledge." ECF No. 1 at 1; ECF No. 12 at 4. The same is true for Plaintiff's verification at the conclusion of his response in opposition to the Defendants' motion for summary judgment. ECF No. 28 at 31. These filings fail to meet the requirements of Fed. R. Civ. P. 56(c)(4), which requires that an affidavit or declaration in opposition to a motion for summary judgment be "made on personal knowledge, [and] set out facts that would be admissible in evidence . . . ." Under the rule, information and belief do not suffice. *See also* Fed. R. Evid. 602 (to be admissible, evidence must be shown to be based on witness's personal knowledge). So too for Plaintiff's "Declaration," which appears at pp. 1–7 of his opposition, as well as his "statement of disputed facts" at pp. 8–9. ECF No. 28. Accordingly, to the extent Plaintiff relies upon these filings to oppose summary judgment, he cannot do so.

2

In 2017, Plaintiff was allowed to participate in a social work group program and "excelled." ECF No. 1 at 8. However, after completing one group cycle, Defendants discontinued group programming for inmates housed on administrative segregation. *Id.* Plaintiff also states that he has sought out therapy sessions with psychologists, a social worker, and the prison Chaplain, but all requests were denied. *Id.*

Plaintiff also complains that he has not been provided daily out-of-cell activity because Defendants discontinued the use of inside recreation halls; outside recreation is limited to five days per week when weather permits but outside recreation for administrative segregation was moved to the "midnight shift to increase the probability of inclement weather" requiring cancellation. ECF No. 1 at 8. He further claims he is not allowed to use the telephone, but also inconsistently states he is "only allowed three (3) thirty (30) minute phone calls a week." *Id.* at 8-9. He states one of the allotted times for phone calls is between 1:00 a.m. and 2:00 a.m. *Id.* at 9.

Plaintiff also claims he does not have access to religious services, nor does he have access to the prison Chaplain because the Chaplain does not make regular rounds in administrative segregation. ECF No. 1 at 9. He explains that he recently had a death in his family but was not notified even after his family repeatedly called the Chaplain in order to have Plaintiff notified. *Id.*

Plaintiff asserts he does not have access to the courts and recalls that he has at times gone "months without law library access." ECF No. 1 at 9. He states that when he did receive requested material it was outdated, incomplete, poorly copied, or arrived so late it imperiled his case. *Id.*

When Plaintiff complained about the conditions in administrative segregation through the use of informal complaints, he claims Defendants responded in "a vindictive and retaliatory manner by implementing harsher recreation and telephone schedules and discontinuing social work group programs." ECF No. 1 at 9-10. He claims all of his administrative remedy procedure

3

complaints ("ARPs") were dismissed and the Inmate Grievance Office ("IGO") "rubber stamped the status quo by ultimately refusing the 'required' hearing." *Id*. at 10.

In September of 2018, Plaintiff states he was "briefly assigned to Max II Housing" which he describes as "a less severe form of Restrictive Housing" because inmates are locked down for 22 hours a day instead of 23 hours a day.  ECF No. 1 at 10.  Plaintiff stayed in this housing assignment without incident until February 2019 when he was moved back to administrative segregation for the same reason stated for his initial assignment.  *Id*. at 10-11.

Plaintiff alleges he never received the initial review for the February 2019 placement in administrative segregation which was supposed to have occurred within five days of his assignment.  ECF No. 1 at 11.  He claims this failure, as well as the failure to conduct subsequent periodic reviews, was a violation of due process.  *Id*.  He further alleges that monthly segregation reviews did not occur in his case until he filed an IGO complaint and appealed the dismissal to the Circuit Court for judicial review.  *Id*.  It was not until that case was pending in the State court that Plaintiff discovered the specific reason for his assignment to administrative segregation.  *Id*.

Plaintiff asserts that Defendants violated his right to due process by denying him "meaningful Case Management Reviews;" excluding him from programs and services; assigning him to restrictive housing; and refusing to provide him with IGO hearings for a cognizable grievance.  ECF No. 1 at 13.  Second, Plaintiff claims that he was denied equal protection when other similarly situated inmates were permitted privileges (recreation, telephone use, and programming) that he was denied.  *Id*. at 14.  Third, he claims he was denied due process when Defendants refused to address formal ARP complaints and failed to "train subordinates when policy omissions became known to them." *Id*. at 15.  Fourth, he claims that Captain Iser violated the Eighth Amendment and Article 25 of the Maryland Declaration of Rights when Captain Iser

changed the administrative segregation schedule for recreation and telephone use and eliminated access to programming. *Id.* Lastly, Plaintiff claims he has been denied his First Amendment right of access to the courts because Defendants did not take action to correct the law library system when he brought the failures of that system to Defendants' attention. *Id.* at 16.

    **B.**    **First Motion for Temporary Restraining Order**

On May 22, 2020, this Court directed Defendants to respond to Plaintiff's Motion for Temporary Restraining Order. ECF No. 3. The response indicated that Plaintiff was no longer assigned to administrative segregation; rather, he was assigned to "Maximum Security II—Structured Housing" or "MIISH" on April 1, 2020. ECF No. 6. It was explained that this modified housing assignment was approved on May 26, 2020. *Id.* The response further explained that Plaintiff was assigned to administrative segregation in February of 2011 because while he was housed at Western Correctional Institution, he killed his cellmate, Timothy Davis. ECF No. 6-1 at 2, ¶ 4. Plaintiff was transferred to NBCI and later pled guilty to second-degree murder for which he was sentenced to 17 years of incarceration. *Id.* Additionally, Plaintiff has a history of threats and assaults against inmates and correctional staff making it "difficult, if not impossible, to house [him] in general population." *Id.*

When Plaintiff arrived at NBCI in 2011, he was assigned to disciplinary segregation and received an additional sanction of 730 days disciplinary segregation for assaults on staff. ECF No. 6-1 at 2, ¶ 5. He was placed on administrative segregation when his disciplinary segregation ended so staff could determine his suitability for placement in general population. *Id.* He remained on administrative segregation until September 29, 2018, when he was placed in Maximum Security-II general population where he remained until February 4, 2019. *Id.* Information was received that Plaintiff had made a "credible threat against the lives and safety of correctional staff at NBCI."

*Id*.  Based on that information, Plaintiff was moved back to administrative segregation while the threats were investigated.  *Id.*

Although Plaintiff was considered for a possible transfer out of state under the Interstate Corrections Compact (ICC), the application was denied by Division of Correction Headquarters in March of 2015.  ECF No. 6-1 at 3, ¶ 6.  Given the limited options for housing Plaintiff safely, the case management team considered him for MIISH assignment in February of 2016.  *Id*.  In the interim, Plaintiff remained assigned to administrative segregation so that both staff and other inmates could be protected from Plaintiff.  *Id*.

On May 26, 2020, Plaintiff was approved for assignment to MIISH.  ECF No. 6-1 at 3, ¶ 7.  The benefit of this assignment is that it allows for Max II inmates like Plaintiff to progress towards less restrictive housing through the use of "incentive-based programming intended to adjust inmate behavior that has posed a serious threat to life, property, self, staff, other inmates or facility security."  *Id*.  At the time the response was filed, Plaintiff was approved for Phase II of the program.  *Id*.

Based on the information provided in the response, this Court denied Plaintiff's Motion for Temporary Restraining Order as moot.  ECF No. 9.  Plaintiff then filed an Amended Complaint and a second Motion for a Temporary Restraining Order.  ECF No. 12; ECF No. 13.

### C.    Amended Complaint[2]

Plaintiff claims that his placement in MIISH is punitive in nature and is more restrictive than administrative segregation.  ECF No. 12 at 2, ¶ 6.  He implies that it is not suitable for him because it is "meant to coerce habitually troublesome inmates into following institutional rules and regulations."  *Id*.  Plaintiff points to the absence of any "serious rule violation" incurred by him

---

[2] The amended complaint incorporates by reference the entire original complaint.  ECF No. 12 at 1, ¶ 1.

since June of 2011 as evidence that this assignment should not be applied to him.  *Id*. at ¶ 7.  He further claims that his assignment to MIISH is retaliatory and that he has been harassed since filing his complaint with this Court.  *Id*. at 3, ¶¶ 11, 12.  He additionally claims that his assignment to MIISH without "affording him due process" violates the Fourteenth Amendment and specifically claims that Defendants William Iser, Jason McMahan, and Richard Roderick are responsible for violating his rights.  *Id*. at ¶ 13.  Plaintiff further contends that his assignment to MIISH was malicious, retaliatory, and constitutes cruel and unusual punishment "in further violation of the Eighth and First Amendments of the U.S. Constitution."  *Id*. at ¶ 14.

Plaintiff's second Motion for Temporary Restraining Order seeks an Order from this Court requiring Defendants to cease: holding him in restrictive housing "without cause;" denying him due process; tampering with his outgoing mail to the courts; denying him adequate access to the courts by limiting his access to legal materials; and retaliating against him by taking away his "telephone use time," attempting to "incite him into an infraction," refusing to provide ARP forms or process those he turns in, taking away his recreation time, disregarding DOC policies, and refusing to process his sick call slips.  ECF No. 13.

### D.    Defendants' Motion for Summary Judgment

Defendant Jason McMahan[3] provides a declaration in support of the motion explaining that the Maryland DOC has five levels of security: Pre-Release, Minimum, Medium, Maximum I, and Maximum II.  ECF No. 19-2 at 3, ¶ 5.  Security levels of inmates are reviewed annually.  *Id*. at ¶ 6.  Plaintiff was classified as "Maximum Security I until NBCI was provided a Maximum II Security level effective March 4, 2014."  *Id*.  On July 28, 2014, Plaintiff was increased to Maximum II and has remained at that security level.  *Id*.

---

[3] McMahan was not a part of the team that decided to place Plaintiff in the MIISH category because at the time this decision was reached, he was deployed with the military.  ECF No. 19-2 at 4, ¶ 10.

Plaintiff was moved to MIISH, a housing assignment, on May 26, 2020, after an investigation into the threats he reportedly made. ECF No. 19-2 at 4, ¶ 11. Transferring Plaintiff to another prison is not an option because NBCI is the only Max II facility in Maryland. *Id*. at 5, ¶ 13. Due to his history of assaults, his verified membership in a prison gang (Bloods), and the fact that he killed his cellmate, Plaintiff cannot be placed in protective custody. *Id*.

Monthly reviews of Plaintiff's assignment to administrative and disciplinary segregation took place and Plaintiff "periodically agreed to attend." ECF No. 19-2 at 5, ¶ 14. On the following dates Defendants maintain that Plaintiff refused to attend the monthly reviews: January 4, 2017; March 29, 2017; September 13, 2017; April 25, 2018; May 23, 2018; June 20, 2018; July 12, 2018; August 15, 2018; and September 13, 2018. *Id*. After he was placed back into administrative segregation in February of 2019, he refused to attend monthly segregation reviews on February 6, 2019; April 3, 2019; May 1, 2019; July 24, 2019; September 18, 2019; November 13, 2019; December 11, 2019; and January 8, 2020. *Id*.

The monthly reviews attended by Plaintiff occurred on February 1, 2017; March 1, 2017; July 19, 2017; August 16, 2017; October 11, 2017; December 6, 2017; January 3, 2018; January 31, 2018; February 2, 2018; March 28, 2018; May 29, 2019; June 26, 2019; October 16, 2019 February 5, 2020; and March 3, 2020. *Id*. at ¶ 15. When there was cause for concern for security, or there were staffing concerns, or COVID-19 protocols required it, monthly segregation reviews were held in absentia. *Id*. The reviews that were held in absentia occurred on May 24, 2017; November 18, 2017; March 6, 2019; August 21, 2019; April 1, 2020; April 29, 2020; and May 27, 2020. *Id*.

Refusals to attend monthly segregation reviews are documented by the escorting officer who advises the inmate of the pending review. ECF No. 19-2 at 5-6 ¶ 16. When Plaintiff has

refused to attend the meeting, the escorting officer advised the Case Management team of the reason for his refusal, a "Waiver and Notice of Case Management Action form" was drafted and provided to the escorting officer.  *Id*.  The escorting officer took the form to Plaintiff and asked him to sign the form and the officer would sign as a witness.  *Id*.  In the event Plaintiff refused to sign the form, the escorting officer would have a second officer sign as witness attesting that Plaintiff refused to sign the form.  *Id*.  The waiver forms provided to Plaintiff that indicate Plaintiff's refusals to attend monthly reviews do not include any signatures.  ECF No. 13-2.

McMahan describes the general conditions on administrative segregation as follows:

> While housed on administrative segregation, an inmate is separated from the general population.  Inmates on administrative segregation come into contact with only their cell mate unless they are single celled.  Inmate Boyer is single celled because he previously killed his cellmate.  When an inmate is removed from his cell, he will be handcuffed and escorted by an officer.  While on administrative segregation an inmate is allowed three showers each week, a weekly change of bed linen, monthly haircuts, out of cell activity, health care, and monthly reviews by case management staff.  The cell lights are generally turned off at night; with the exception of special housing inmates, the inmates are in control of the lights inside the cell.  With regard to special housing inmates, correctional officers will turn off the lights.  Out of cell activity is scheduled for one hour, outside, at least five days each week, weather permitting.  In addition, administrative segregation inmates have access to educational services if provided by the Maryland State Department of Education, library services, legal reference materials, access to a chaplain for religious assistance, mail, commissary and the administrative inmate cleans his cell at least once each week.  Inmates can access library material by writing to the NBCI Librarian and can submit LASI requests to obtain legal cases.  Segregation inmates are further allowed one non-contact visit per week and two (2) telephone calls.

ECF No. 19-2 at 6-7, ¶ 17.

Medical, dental, and mental health care is accessible to administrative segregation inmates through use of sick call slips that are reviewed by medical staff.  *Id*. at ¶ 18.  Medical staff additionally conduct rounds in Housing Unit 1 (which contains administrative segregation and other restrictive housing assignments) three times daily and include dispensing medication.  *Id*.

Psychological and psychiatric treatment is also available upon request.  *Id.* at ¶ 19.  If an inmate requests mental health treatment, the request is assessed by mental health professionals and his concerns are addressed.  *Id.*  If needed, appropriate medications are prescribed or discontinued at the direction of the psychiatrist.  *Id.*  Medications that are prescribed are dispensed during the rounds made by medical staff.  *Id.*  Additionally, a nurse makes rounds in the disciplinary and administrative segregation units on a weekly basis for the purpose of determining whether an inmate is experiencing worsening mental health symptoms.  *Id.*

The COVID-19 pandemic required changes for the management of administrative segregation inmates.  ECF No. 19-2 at 7, ¶ 20.  On March 13, 2020, in person visitation at NBCI was suspended except for attorney visits.  *Id.*  On April 6, 2020, outside recreation was suspended.  *Id.*  On April 11, 2020, video Skype visits were implemented.  *Id.*  On May 12, 2020, modified outdoor recreation began for Housing Unit #1 and social distancing was enforced.  *Id.*  Further, Case Management conducts its reviews in absentia unless a face-to-face interview is required and administrative approval is obtained.  *Id.*  Nothing changed regarding access to medical and mental health care.  *Id.* at 7-8, ¶ 20, *see also* ECF No. 19-7 at 3, ¶ 10.

To determine if an inmate is suitable for placement on MIISH, certain behaviors by the inmate are considered.  Ex. 1 to McMahan Dec., ECF No. 19-3 (Facility Directive No. DOC.100.0004).  These behaviors include: murder or attempted murder; organizing inmate disturbances or protests; assault or attempted assault involving a weapon; assault or attempted assault on staff or individuals other than inmates; assault or attempted assault on an inmate with the intent to commit, or resulting in, serious personal injury; hostage taking; escape or attempted escape; possession of escape paraphernalia; and other behavior demonstrating a serious threat to life, property, self, staff, other inmates or facility security.  *Id.* at 16 (Max II Structured Housing

Notification of Consideration for Placement).  Although these behaviors are considered, MIISH

status is "independent of disciplinary sanctioning permitted under the inmate disciplinary process"

and MIISH assignment may not be approved as a sanction imposed for a disciplinary proceeding.

*Id*. at 4, ¶ B(1) and (2).  There are four phases through which MIISH inmates may progress.  *Id*. at

7-11.  Plaintiff is in Phase II which is described as follows:

(3)      MAX II SH Phase II:

　　　(a)      Requires MAX II SH inmate to remain at that phase for a minimum of 60
　　　calendar days;
　　　(b)      Permits program activities to be conducted in a group of up to four inmates
　　　all of which are to be restrained at a restraint table;
　　　(c)      Limits personal property to provision of the Allowable Personal Property
　　　Matrix designated for MAX II general population, except video games and
　　　recreational items, which are not permitted;
　　　(d)      Requires the MAX II SH inmate to only wear State-issued clothing;
　　　(e)      Has a maximum of $35 per week (Sunday – Saturday) for commissary
　　　purchases;
　　　(f)      Permits a maximum of 3 meals each day to be consumed while in the
　　　MAX II SH inmate's cell
　　　(g)      Permits up to 3 showers in a 7 day period (Sunday-Saturday);
　　　(h)      Permits 2 hours each day of the week (Sunday-Saturday) out of cell
　　　activity . . . the inmate is restrained with the inmate's hands behind the back
　　　when escorted;
　　　(i)      Requires that, when outside the MAX II SH inmate's cell . . . shall be
　　　restrained with the MAX II SH inmate's hands behind the back when escorted;
　　　(j)      Allows one non-contact visit each week (Friday – Sunday) but does not
　　　limit legal visits with the MAX II SH inmate's attorney of record;
　　　(k)      Permits two telephone calls each week (Sunday – Saturday), but does not
　　　limit emergency telephone calls or calls from the inmate's attorney of record;
　　　(l)      Permits television privileges (limited to self-help programs and reading)
　　　and
　　　(m)      Permits housing unit library privileges (limited to self-help programs,
　　　reading, and legal reference material).

ECF No. 19-3 at 8-9.

Progression to a different level with more privileges attached to that level is determined by inmate behavior. *Id*. at 11, § G(1). A multi-disciplinary team[4] reviews the assignment every seven days during the initial 60 days an inmate is assigned to determine if continuation at that level is justified. *Id*. at §G(2). After the initial 30 days of assignment, the multi-disciplinary team may meet with the inmate to review his performance and behavior every 30 days to determine if a change is appropriate. *Id*. at § G(3). If a change in the level is deemed suitable, the case management member of the multi-disciplinary team is required to complete the paperwork recommending the change to the managing official for approval and the inmate is notified. *Id*. at § G(4)(a). If a change is deemed not suitable, the case manager makes "a Confidential Note entry in OCMS" and notifies the inmate. *Id*. at § G(4)(b).

Defendants submit a series of declarations from DOC officials with knowledge of Plaintiff's claims in support of their motion. Defendants Bishop, Iser, and Thomas deny harassing or retaliating against Plaintiff or otherwise preventing him from participating in the use of the phone, recreation, or access to legal materials. ECF No. 19-5 (Bishop Decl.), ECF No. 19-6 (Iser Decl.), ECF No. 19-7 (Thomas Decl.). Captain Iser was the Housing Unit Manager of Housing Unit #1 at NBCI until October 23, 2019. ECF No. 19-6 at 2, ¶ 4. On February 4, 2019, Iser performed an investigation into the allegation that Plaintiff wanted to assault and/or kill correctional officers and solicited the assistance of other inmates in the endeavor. *Id*. at ¶ 5. Iser determined that the information came from a reliable source. *Id*. Based on his investigation, Iser recommended that Plaintiff be placed in administrative segregation until the investigation could

---

[4] The multi-disciplinary team includes: a chairperson who is a case management manager, case management supervisor, or case management specialist II; a psychology or social work staff member; and a correctional officer holding the rank of sergeant or above. ECF No. 19-3 at 5, § C(2).

be completed.  *Id.* at 2, ¶ 6.  Iser also believed that Plaintiff may be better suited for structured

housing rather than general population.  *Id.*

Iser participated in a number of Plaintiff's case management reviews, and states that

Plaintiff was permitted to meet with case management.  ECF No. 19-6 at 3, ¶ 7.  Plaintiff had the

same access to activities as other inmates on administrative segregation; specifically, he was

allowed three showers per week, two telephone calls per week, out of cell activity, and recreation.

*Id.* at 3, ¶ 8.  Iser also maintains that Plaintiff had access to medical and mental health treatment

through use of Sick Call Encounter requests, or through contact with medical staff during their

regular rounds in the housing unit.  *Id.* at ¶ 9.  Iser also confirms that, due to the COVID-19

pandemic, NBCI now conducts visitation via Skype, and case management is reviewed in absentia

unless both a face-to-face interview is required, and administrative approval is obtained.  *Id.* at ¶

11.  Further, outdoor recreation was suspended on April 6, 2020, and was modified for Housing

Unit #1 on May 12, 2020 to accommodate strict social distancing protocol.  *Id.*  The reason for

Plaintiff's assignment to MIISH, according to Iser, was an investigation into the threats Plaintiff

made against staff and due to his institutional record.  *Id.* at ¶ 12.  The assignment was not

retaliatory.  *Id.*

Iser was assigned to investigate one of Plaintiff's ARPs (NBCI-1810-19) which concerned

Plaintiff's claim that he was not being provided access to the library or library material.  ECF No.

19-6 at 3, ¶ 13.  This was the only complaint handled by Iser.  *Id.*

Lieutenant William Thomas was a Correctional Officer Sergeant at NBCI between

September 10, 2008 until November 4, 2019.[5]  ECF No. 19-7 at 1, ¶ 3.  Thomas was a Sergeant at

NBCI, and he participated in a number of Plaintiff's case management reviews while Plaintiff was

---

[5] Thomas was promoted and transferred to WCI on November 4, 2019.  ECF No. 19-7 at 1, ¶ 3.

assigned to administrative segregation.  *Id.* at ¶ 6.  Thomas recalls that Plaintiff was permitted to meet with case management during the reviews if he chose to do so.  *Id.*  He also maintains that Plaintiff had the same access to activities as other inmates in segregation; specifically, three showers per week, two telephone calls per week, out of cell activity, and recreation when weather permitted.  *Id.* at 2, ¶ 7.

Finally, Director F. Todd Taylor, Jr., the Executive Director of the IGO, stated that Plaintiff filed three IGO grievances, all between March 27, 2018 and February 27, 2019, all of which were dismissed.  ECF No. 19-8 ¶ 4; ECF No. 19-11 at 6.

In addition to the declarations, Defendants submit documentation of the final action on Plaintiff's various grievances.  As to his March 27, 2018 grievance alleging that his placement on Administrative Segregation was unjust or improper, the IGO found Plaintiff failed to state a claim and failed to allege the procedures leading to his placement significantly departed from the Division of Correction Manual.  ECF No. 19-9 at 2.

Plaintiff's April 9, 2018 grievance was dismissed as being repetitive of his initial grievance.  ECF No. 19-10 at 2.  And Plaintiff's third grievance, dated February 27, 2019 and relating to his complaint of being improperly transferred to administrative segregation, was dismissed for—again—failure to allege any significant departure from the Division of Correction Manual.  ECF No. 19-11 at 6.  The Circuit Court for Alleghany County affirmed the dismissal of this third grievance.  *Id.* at 2.

### E.    Plaintiff's Response in Opposition

Plaintiff states that on February 13, 2011, he was involved in a fight with his cellmate Timothy Davis and "the fight went further than [he] intended."  ECF No. 28 at 2, ¶ 4.  He claims that the fight evolved because Davis was attempting to sexually assault him.  *Id.*  Plaintiff also

maintains he does "not remember much of being transferred to NBCI" due to the fact that he was "distraught because of the fight" and states his belief that he was "locked in an intense Psychosis, where [he] was not oriented to time, person or situation."  *Id*. at ¶ 6.  He states he remained in that state until August of 2011.  *Id*. at ¶ 7.

Plaintiff states that while he was on disciplinary segregation, he requested social group programming ("BMP") and other psychological help but was told he did not meet the requirements for participation and was denied three times.  ECF No. 28 at 3, ¶ 9.  He did however participate in a "Psych program" with "Nurse Kathy" but the program ended when she left NBCI.  *Id*. at ¶ 10.

After his disciplinary segregation sentence was completed, Plaintiff was assigned to administrative segregation and he was only told that there were reasons to believe he presented a danger to the security of the institution, inmates, and/or staff.  ECF No. 28 at 3, ¶ 11.  He states he remained on administrative segregation without incurring any infractions until September of 2018, when he was assigned "to a less restrictive form of segregation; Max II Structured Housing."  *Id*. at ¶ 12.

In Plaintiff's view, he was given only "perfunctory monthly seg reviews" and they were performed at "inconsistent intervals."  ECF No. 28 at 3, ¶ 13.  When he actually was able to attend the reviews, he was simply left on administrative segregation "long term" without any "programming pathways" to leave segregation status.  *Id*. at ¶ 14.  Plaintiff was never given any rationale for the continuation of his administrative segregation status.  *Id*. at 4, ¶ 15.  Further, Plaintiff states he was denied group program participation until 2017, when he was allowed to participate in a group book study program.  *Id*. at ¶ 16.  He was, however, only able to complete one cycle of this group because the unit manager, Lt. Iser, discontinued group programming and education for administrative segregation inmates.  *Id*. at ¶ 17.

Plaintiff also states that Iser cancelled the use of inside recreation halls for administrative segregation inmates which meant that recreation outside would only be permitted if the weather allowed for it.  ECF No. 28 at 4, ¶ 18.  He further claims that Iser "moved recreation to the midnight shift where the probability of weather cancellations [was] higher."  *Id.*  Iser also changed the schedule for phone use from five days a week to three days a week, and one time slot was between 1:30 a.m. and 2:00 a.m.  *Id.*

Plaintiff states that when he was placed back in administrative segregation in February of 2019, he was never interviewed about the alleged threats he made, nor was he given a hearing or an explanation as to why he was so assigned.  ECF No. 28 at 5-6, ¶¶ 25-26.  He denies ever making any threats against officers and notes that he was never charged with violation of an inmate rule in connection with such threats.  *Id.* at 6, ¶ 27.  He describes MIISH as a supermax program in which he was placed without corroboration of the allegation that he made any threats towards staff.  *Id.* at ¶ 28.  He adds that Defendants have discriminated against him because they have allowed White inmates out of administrative segregation even though they had accumulated multiple serious rule violations that included assaults on officers and weapons manufacturing while he has remained infraction free.  *Id.* at 7, ¶ 32.

## II.  Standard of Review

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted."  This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specifically, a plaintiff must establish "facial

16

plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. The court need not accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  Well-pleaded facts as alleged in the complaint are accepted as true.  *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).  Factual allegations must be construed "in the light most favorable to [the] plaintiff."  *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (quoting *Battlefield Builders, Inc. v. Swango,* 743 F.2d 1060, 1062 (4th Cir. 1984)).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex*, 477 U.S. at 322-23.  On those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact and the moving party is plainly entitled to

judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In this inquiry, a court must view the facts and the reasonable inferences drawn "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs.*

*Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without needed discovery.  Fed. R. Civ. P. 56.  Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive."  *Harrods*, 302 F.3d at 244 (quoting 10B Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

## III.   Discussion

### A.       Due Process—Fourteenth Amendment

Plaintiff first claims that Defendants denied him his right to due process by refusing to allow him to attend and/or holding monthly reviews; refusing his access to programs and services to facilitate his release from restrictive housing; and refusing to hold IGO hearings for cognizable claims raised.  ECF No. 1 at 13, ¶ 61.  Defendants assert that Plaintiff's assignment to administrative segregation and MIISH status does not implicate a liberty interest requiring due process protections.  ECF No. 19 at 19-20.

Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)); *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005).   Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . . fact specific" comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There

is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)).  "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection."  *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions" for Due Process protections to apply.  *Id.* (emphasis in original) (citing *Wilkinson*, 545 U.S. at 224-25).

"[G]eneral population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence."  *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015).  Where, as in *Bevarati v. Smith*, 120 F.3d 500 (4th Cir. 1997), conditions in segregated confinement are "similar in most respects to those experienced by inmates in the general population" no liberty interest exists in avoiding that segregation assignment.  *Beverati*, 120 F.3d at 503.  Where an inmate is sentenced to death row, as in *Prieto*, "using the general population to gauge the ordinary incidents of prison life . . . was improper."  *Incumaa*, 791 F.3d at 528 (citing *Prieto*, 780 F.3d at 252-54). While the nature of a prisoner's conviction and the length of his sentence do not give rise to differing liberty interests, "state law mandates regarding the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence are, by definition, the ordinary incidents of prison life for such offenders."  *Id*. (quoting *Prieto*, 780 F.3d at 254).

In *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005), the Supreme Court found a liberty interest implicated where inmates in Ohio were assigned to the Ohio State Penitentiary (OSP), a

super-maximum-security prison where almost all human contact was prohibited and communication between cells was forbidden.  Exercise was limited to one hour a day in a small indoor room, and the inmates were exposed to light 24 hours per day.  *Id*.  The Court noted that although the conditions alone were not enough to create a liberty interest, when coupled with the indefinite duration of assignment[6] to the prison and the disqualification of an otherwise eligible inmate for parole consideration, the conditions "impose an atypical and significant hardship within the correctional context."  *Id*. at 224.

The *Wilkinson* Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates receive written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and were provided a prepared form explaining why the review was initiated.  *Wilkinson*, 545 U.S. at 216.  The Ohio inmate was permitted to attend the hearing where they were allowed to offer "pertinent information, explanation and/or objections to OSP placement and may submit a written statement," but the inmate could not call witnesses.  *Id*.  In addition to the notice and the hearing, the Ohio system included a review of the committee's decision by the warden, who must provide reasons for an approval of an assignment, as well as an additional review by a bureau which was vested with final decision-making authority over all inmate assignments in Ohio.  *Id*.  After these reviews were completed, the inmate was allowed 15 days to file objections with the Bureau and it was only after this 15-day period expired that the inmate was transferred to the facility.  *Id*. at 217.

---

[6] The District Court noted that the length of an inmate's stay at the prison was a function of the procedures for review in place.  *See Austin v. Wilkinson*, 189 F. Supp. 2d 719, 740 (N.D. Ohio 2002).  Inmates assigned to the prison could only progress through the various levels after reclassification reviews which were conducted annually and "even inmates with exemplary behavior rarely progress through OSP in less than two years."  *Id*.

Inmates who were transferred were given another review within 30 days of their arrival and, thereafter, were reviewed yearly.  *Id.*

The procedures in place at the Ohio prison are materially similar to those outlined in the procedures for assignment to administrative segregation and to MIISH status.  Here, however, Plaintiff maintains that when the reviews occurred, they were perfunctory and that he was denied the opportunity to attend such reviews on several occasions.  Further, and more importantly, Plaintiff asserts that he was never given the opportunity to address the allegation that he had made threats against staff which Defendants relied upon to return him to administrative segregation. Defendants have not provided this Court with evidence supporting their conclusion that the reported threats came from a reliable source, nor has the Court received a copy of the investigation that was conducted in light of the report.  Even with this oversight, however, Plaintiff was not left on administrative segregation for an inordinate period of time following the investigation.  Rather, he was moved to MIISH, which he describes as a less restrictive housing assignment, ECF No. 1 at 10, and addresses his assertion that he should be given a way to earn his way out of such housing and back to general population.

Assuming Defendants did not strictly comply with the rules governing review of Plaintiff's administrative segregation housing, that asserted failure does not change the analysis.  A violation of prison policy alone does not state a Fourteenth Amendment due process violation.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*).  Additionally, lack of access to programming such as group therapy does not alone imply that a Fourteenth Amendment violation has occurred.  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the

conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976), s*ee also Sandin*, 515 U.S. at 493, requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest.

Plaintiff also claims he was denied due process when Defendants refused to address formal ARP complaints and failed to "train subordinates when policy omissions became known to them." ECF No. 1 at 15. This claim is without merit. Where, as here, the matters asserted pertain to issues that do not amount to a protected liberty interest and nothing in the Constitution mandates an administrative hearing on the merits of a grievance, the claim must fail. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (discussing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994)); *see Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, arguendo, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated" because "'inmates have no constitutional entitlement or due process interest in access to a grievance procedure.'") (quoting *Booker*). To the extent Plaintiff is asserting a violation of Maryland State law in connection with the IGO's failure to provide him with a hearing, that claim may be raised in the State courts through an action for mandamus or appeal of an administrative agency appeal. Md. Code Corr. Servs. §§ 10-207, 10-210. Defendants are entitled to summary judgment on this claim.

### B.     Equal Protection

Plaintiff claims that Defendants arbitrarily denied him the opportunity to participate in programs, extended recreation, and telephone use while bestowing those same opportunities on "similarly situated" inmates. ECF No. 1 at 14, ¶ 65. In his Opposition Response, Plaintiff states that White inmates were treated more favorably than African American inmates. ECF No. 28.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citation omitted). In cases where no suspect criterion, such as race, is involved, the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989). If the discrimination was based on a plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, the plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose. *See Cleburne*, 473 U.S. at 440-42.

The key to an equal protection claim requires a showing "that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1027, 1051-52 (8th Cir. 1998). Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoners' claims under the equal protection clause . . . must still be analyzed in light of the special security and management concerns in the prison system."[7] *Morrison v. Garraghty*, 239 F.3d 648, 655 (4th Cir. 2001) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.").

---

[7] A prisoner's rights under the Constitution must not be inconsistent with his or her status as a prisoner. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 409-10 (1989).

With the exception of Plaintiff's conclusory allegation that inmates in restrictive housing are treated differently on the basis of their race, there is nothing in this record to support such a finding.   The claim is vague, does not include any concrete examples of the asserted discrimination, and fails to describe how inmates who were treated favorably are in all relevant respects similarly situated to Plaintiff.   For example, there is nothing in the record on which to base a comparison of inmates such as institutional record, criminal offense, and other considerations relied upon by prison officials to decide how and where to house certain inmates.   Specifically, at page 26 of his opposition, Plaintiff states there is racial discrimination as to the inmate designations.   As support, Plaintiff cites to his declaration, pages 1–7 of his opposition, which (as noted, *supra*, note 1) is not verified, sworn, or based on personal knowledge.   In citing to his declaration, Plaintiff fails to meet the requirements of Fed. R. Civ. P. 56(c)(4) to support his claim that Defendants engaged in racial discrimination, and therefore his citation to his declaration fails to create a dispute of material fact.

And while Plaintiff has submitted an affidavit purportedly supporting his claim of race-based disparate treatment (Pl.'s Opp. 27 (citing Cotter Aff., ECF No. 28-10), the affidavit he cites fails to create an issue of material fact on this claim.   Inmate Cotter states he "was let off of ad seg in 2018 arbitrarily and capriciously after serving his seg time for possessing a weapon." Cotter Aff. ¶ 8.   The affidavit states, in conclusory fashion, that Plaintiff and Inmate Cotter are similarly situated.   However, Plaintiff has admitted to killing another inmate in 2011 whereas Inmate Cotter admits in his affidavit to possessing a weapon.   Cotter Aff. ¶ 8.   The Cotter Affidavit fails to present more than a scintilla of evidence to support an equal protection claim against Defendants. *See Anderson*, 477 U.S. at 252.   Further undermining the Cotter affidavit is Correctional Case Management Specialist John White's supplemental declaration, submitted as Exhibit 1 to the

25

Defendants' reply, stating Cotter's assignment—in administrative segregation—is more restrictive than Plaintiff's assignment to "MAXSHII [which] is a step-down program with the goal of encouraging behavior that allows the inmate to eventually be released to general population." Ex. 1 to Defs.' Reply 2, ¶ 7, ECF No. 31-2.

Thus, there is nothing to support the assertion that the only reason some prisoners received less favorable treatment is due to their membership in a suspect class. Defendants are entitled to judgment in their favor on this claim.

## C.    Eighth Amendment Claim

Plaintiff asserts that the conditions in administrative segregation and MIISH were made more harsh and outside of the boundaries set by applicable regulations by Defendant Iser when he changed the schedules for use of the phone, moved recreation to a night time schedule and terminated programming. ECF No. 1 at 14, ¶ 73.

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind."

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted).

"[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993).

26

In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler*, 989 at 1381). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011).

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 302-03 (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Defendants have presented evidence of an objective basis for Plaintiff's assignment to restrictive housing, citing the limited options at their disposal for ensuring the safety of both staff and other inmates in light of Plaintiff's past behavior (which includes killing his cellmate) and his alleged threats to commit further acts of violence.  The accuracy of the information Defendants received about Plaintiff's intentions is not dispositive.  Defendants are charged with the unenviable task of attempting to predict which of the numerous inmates in their custody may or may not endanger the prison population and staff.  To do so, they are often required to rely on the information they have available and cannot choose to simply ignore what has been established as a credible threat.  Moreover, there is no objective evidence on this record that either Plaintiff's long-term assignment to restrictive housing or his limited access to phone use, library attendance, or recreation has had a significant and serious deleterious effect on either his mental or physical health.  Without evidence of such an injury, the Eighth Amendment claim fails.[8]

### D.    Access to the Courts

Plaintiff alleges he has been denied his First Amendment right of access to the courts when Defendants did not take action to correct the law library system after they were notified of the problem.  ECF No. 1 at 16.

Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 821 (1977).  However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

---

[8]    Considering the Eighth Amendment and Article 25 of the Maryland Declaration of Rights are construed *in pari materia*, the state claim similarly fails.  *Taylor v. Somerset Cty. Comm'rs*, No. RDB 16-0336, 2016 WL 3906641 at *6 n.5 (D. Md. July 19, 2016)

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399. The right of access to the courts is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury,* 536 U.S. 403, 415 (2002). Conclusory allegations are not sufficient in this regard. *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal).

While Plaintiff explains his frustration with receiving illegible copies of cases and delayed responses to his requests for cases, he fails to describe how the failure to provide him with the cases requested caused him an actual injury. Additionally, the papers filed by Plaintiff in this case do not support his contention that he has no access to legal materials. He has repeatedly mounted legal challenges to the conditions of his confinement and cites to applicable regulations as well as case law in support of his contentions. To the extent his legal challenges have been unsuccessful, he fails to delineate a nexus between those failures and his inability to obtain case law in a timely fashion. In short, there is no basis on this record to find that Plaintiff has lost the ability to litigate

an otherwise meritorious claim regarding either his conviction or the conditions of his confinement.  Defendants are entitled to summary judgment on this claim.

    **E.**       **Request for Production and Motion for Extension of Time**

On April 12, 2021, the Court received from Plaintiff a "First Request for Production of Documents," styled as a Fed. R. Civ. P. 34 request.  ECF No. 32.  His request will be denied for the following reasons.  First, the Court has not issued an order authorizing discovery, and therefore the request is premature.  Second, the request is not appropriate to Plaintiff's claims.  While the Fourth Circuit directs district judges to hesitate prior to granting summary judgment against a nonmovant who has sought discovery, the court has also noted it is permissible to enter judgment in such situations where the information sought would not create a genuine issue of material fact.  *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) ("[A] court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment.").  I find that Plaintiffs' requests would not create material disputes of fact sufficient to warrant denying Defendants' summary judgment motion.

I also find that, if construed as a Rule 56(d) affidavit, Plaintiff's request for documents does not militate against granting summary judgment for defendants.  A nonmovant may avoid summary judgment by filing an affidavit or declaration that the nonmovant cannot present certain essential facts to support its opposition.  Fed. R. Civ. P. 56(d).  Plaintiff's request does not amount to a Rule 56(d) affidavit for several reasons, including that the filing is not properly sworn and verified, and because he fails to state with any specificity why the materials requested are essential to justify his opposition.   Assessing each request in turn, I find the materials Plaintiff requests would not give rise to any material facts.

Providing Plaintiff with all of the facility's ARPs and informal complaints regarding administrative segregation, his first request, is well beyond the scope of Plaintiff's claims: he brings suit only on behalf of himself, not any other prisoners at NBCI.   Pl.'s Request for Documents ¶ 1, ECF No. 32.  The same must be said of his fourth, seventh, and eighth requests in which he seeks, respectively, logs, lists, and other documentation regarding grievances by NBCI inmates regarding lack of monthly seg review and lack of access to commissary and the courts; and logs, lists, or other documentation of grievances by NBCI inmates concerning lack of due process.  *Id.* at ¶ 4, 7.

As to Plaintiff's second request, for policies, directives, or instructions regarding administration of the Restrictive Housing Unit, *id.* at ¶ 2, I have already ruled that there is no legal support for the Fourteenth Amendment claim, nor is there any factual support for the equal protection claim, Eighth Amendment, or access to courts claims.   Policies, directives, or instructions would be insufficient to overcome the bar to a Fourth Amendment claim for violation of a prison policy.  *Supra*, p. 22; *see Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*).  Such documents also would fail to supplement the factual allegations that I have found to be lacking.

Regarding his third request, for his complete institutional basefile, Plaintiff provides no information to suggest how production of this material would support his opposition to the motion. As I have previously found, where a prisoner bringing a civil rights claim seeks discovery without elaborating on how the discovery sought is material to his claims, the request for discovery alone is insufficient to prevent summary judgment.  *Peppers v. Moubarek*, Civ. A. No. PWG-19-2346, 2020 WL 5759763, at *7 (D. Md. Sept. 25, 2020) (citing *Gardner v. United States*, 184 F. Supp.

3d. 175, 185 (D. Md. 2016) (denying request because plaintiff expressed mere hope that discovery would yield evidence to establish claim)).

His fifth request, for use of force incident reports, bears no nexus to his claims because Plaintiff has not brought an excessive force cause of action. *Id.* at 5. Accordingly, Plaintiff's request for discovery, filed approximately two months after his opposition brief, does not change the outcome on Defendants' motion.

Additionally, Plaintiff has moved for an extension of time, apparently to respond to the Defendant's reply and to any response by Defendants to the motion for discovery. ECF No. 33 Surreply memoranda are disfavored in this Court, *see* Local Rule 105.2(a) (D. Md. 2021), and Plaintiff's request for production having been denied, there is no need to extend his time to reply to any opposition. Therefore, Plaintiff's motion for an extension of time, ECF No. 33, is denied.

## IV. Conclusion

Having determined that the record evidence does not support a finding that Plaintiff's constitutional rights were violated, this Court GRANTS Defendants' Motion to Dismiss or for Summary Judgment in a separate Order which follows.


__8/27/2021_____                                    _____/s/_____
Date                                                   Paul W. Grimm
                                                       United States District Judge